## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**TRANS TOOL, LLC, and**
**NOAH PLASTIC SUPPLY INC.,**

     *Plaintiffs*,

**v.**                                       **Case No. SA-19-CV-1304-JKP**

**ALL STATE GEAR INC.,**

     *Defendant.* [1]

### MEMORANDUM OPINION AND ORDER

This case involves alleged trademark infringement and unfair competition. Before the Court is *Defendant's All State Gear, Inc.'s Motion for Summary Judgment* (ECF No. 86). The motion is fully briefed, including evidence submitted by both sides.[2] After considering the motion, related briefing, relevant evidence, and the applicable law the Court grants the motion in part as set forth herein.

### I. BACKGROUND[3]

**A. Pleadings**

On November 5, 2019, three plaintiffs (Trans Tool, LLC ("Trans Tool"); Noah Plastic Supply Inc. ("NPS"), and Robert I. Safstrom ("RS")) commenced this action against four defendants (Jimmy Faulkner ("JF"); Grade A Tools, LLC. ("GAT"); All State Gear Inc. ("ASG"); Michael Houy d/b/a All Star Transmission). *See* Compl. (ECF No. 1). An amended complaint

---

[1] The Court identifies only those parties remaining in this case.

[2] Defendant has filed twenty exhibits (ECF Nos. 86-1 and 86-3 through 86-21) with its motion. Plaintiffs have supported their response with seventeen exhibits (ECF Nos. 94-1 and 94-3 through 94-18, the latter seven exhibits filed under seal). The Court later directly addresses the sealing of these exhibits. This Memorandum Opinion and Order does not divulge any information that is properly sealed in this case.

[3] The facts are viewed in the light most favorable to the nonmovants in accordance with the summary judgment standard.

dropped the latter defendant, *see* Am. Compl. (ECF No. 23), and a second amendment dropped RS as a plaintiff, *see* Second Am. Compl. (ECF No. 46) ("SAC"). RS is the sole member of Trans Tool and the sole shareholder and employee of NPS. *See* Dep. RS 40:24-41:11; 88:13-14 (Def.'s Ex. A (ECF No. 86-3)).[4] Because a subsequent settlement dismissal left ASG as the sole remaining defendant, *see* ECF No. 84, the Court may identify the entity simply as Defendant.

Through their operative pleading, the two remaining plaintiffs (hereinafter "Plaintiffs")[5] assert four claims: (1) false designation of origin and unfair competition under 15 U.S.C. § 1125(a); (2) common law trademark infringement; (3) common law unfair competition; and (4) civil conspiracy. SAC ¶¶ 36-61. At the center of these claims are allegations that ASG has infringed upon the three unregistered trademarks ("Unregistered Marks") of Plaintiffs – TRANS TOOL, a parts designation system using "T" and numerals (denoted as T-xxxx), and ATEC.[6] *See id.* ¶¶ 9-15. In addition, Plaintiffs have alleged that NPS "obtained all rights to the assets of ATEC TRANS TOOL LTD, including rights to (a) TRANS TOOL (b) ATEC and (c) the parts designation system developed by Plaintiffs' predecessors in interest." *Id.* ¶ 16. They have further alleged that NPS granted Trans Tool an exclusive license to those matters. *See id.* ¶ 17.Although this case currently proceeds only against ASG, the actions of former defendants remain relevant for background information and because of the asserted civil conspiracy claim.

## B. Other Relevant Persons and Entities

Other persons and entities are relevant in addition to current and former parties. For

---

[4] Plaintiff also provides a portion of this deposition. See Pls.' Ex. B (ECF No. 94-4). In general, the Court will simply cite to the transcript without reference to the exhibit letter or who submitted it.

[5] Defendant takes issue with Plaintiff NPS not selling to the purchasing public or using the claimed marks. *See* Mot at 9; Reply at 2. But the Court sees no reason to separate the two plaintiffs. They are related entities controlled solely by RS. For purposes of summary judgment in this case, whether a claim fails or succeeds, the success or failure falls to both remaining plaintiffs.

[6] This case involves two tools – a Stator Shaft Teflon Seal Installer/Resizer ("Stator Seal Installer"), which Trans Tool calls the T-1503, and a Turbine Shaft Teflon Seal Installer/Resizer ("Turbine Seal Installer"), which Trans Tool calls the T-1574. The parties at times refer to the tools as parts and the Court may use parts and tools interchangeably.

instance, ASG supports its motion with the following exhibits: (A) full transcript of RS's deposition as corporate representative of Plaintiffs, *see* Dep. RS; (B) transcript snippets from Edward Fischer, corporate representative of nonparty Transtar Industries ("Transtar"), *see* Dep. Fischer (Def.'s Ex. B (ECF No. 86-4)); (C-P) various exhibits showing the tools at issue in this case, *see* Def.'s Exs. C through P (ECF Nos. 86-5 through 86-18); (Q-R) two exhibits showing entity name searches for ATEC and Trans Tool, *see* Def.'s Exs. Q and R (ECF Nos. 86-19 and 86-20), and (S) a declaration from Dathan L. Faulkner II ("DL"), *see* Decl. DL (Def.'s Ex. S (ECF No. 86-21)). Plaintiffs' response includes deposition snippets from RS, JF, and sealed partial transcripts of Dathan Faulkner ("DF") and Fischer. *See* Pls.' Exs. B, C, J, and K (ECF Nos. 94-4, 94-5, 94-12, and 94-13). DF provided deposition testimony as corporate representative of ASG. *See* Sealed Dep. DF 22:9-20.

Transtar was Plaintiffs' largest customer and distributor. Dep. RS 100:8-9. According to Transtar, the historical vendors of T-1503 were Trans Tool and Kent-Moore, with ASG arriving years later. Sealed Dep. Fischer (Pls.' Ex. K, ECF No. 94-13) 37:21-38:1. Trans Tool and Kent-Moore were also the historical vendors for T-1574. *Id*. 38:5-7. Because Bosch later bought Kent-Moore, *see id*. 63:24, the Court will refer to them collectively as "Kent."

**C. Relevant Business Information**

GAT sells a variety of automotive parts and tools, including transmission repair tools, mostly online. Dep. JF (Pls.' Ex. C, ECF No. 94-5) 33:22-25; 41:22-24; 50:25-51:14. Relatedly, Defendant ASG manufactures and sells transmission repair parts and tools. *See* Sealed Dep. DF (Pls.' Ex. J, ECF No. 94-12) 23:9-16. China primarily supplies ASG's transmission repair parts and tools. *Id*. 23:12-16. ASG sells many of its products online. *Id*. 35:8-23. JF is GAT's owner and managing member. Decl. RS (Pls.' Ex. I, ECF No. 94-11) ¶ 3. His brother, DF, is the sole shareholder and primary decision maker of ASG. *See* Sealed Dep. DF 17:11-16; 22:24-23:8. DF is

"entirely responsible for sourcing of products" for ASG. *Id*. 42:18-20. In "the 2009 time frame," GAT started buying products from Plaintiffs. Dep. JF 50:6-18.

According to the statement of facts within the response,[7] Trans Tool and its predecessors in interest have been in operations since the 1970's. Trans Tool's predecessor in interest created a unique T-xxxx parts designation system (sometimes referred to herein as the "Parts Designation System") to designate, market, and sell their tools.[8] During the relevant time period for this action, NPS owned the Trans Tool assets and Trans Tool operated the business. In other words, NPS was the holding company and Trans Tool was the operating company.

Trans Tool provides a line of specialty tools for lifting, cleaning, holding, assembling, preparing, and servicing vehicle transmissions. Since the 1970's, it has continuously used the TRANS TOOL mark and the Parts Designation System in connection with its product line. And, since 1996, it has continuously used the ATEC mark in connection with its product line. It has thousands of distributors. Plaintiffs have spent considerable resources in the transmission repair business developing and marketing its tools using the TRANS TOOL mark, the ATEC mark, and/or the Parts Designation System.

"Trans Tools was the only [entity] who ran T numbers since the late '70s." Dep. RS 110:13-14. Kent used "J dash numbers," so when customers see a J-number, "they know it's Kent Moore;

---

[7] RS declares that he has reviewed Plaintiffs' response to the motion for summary judgment and further declares under penalty of perjury that the facts stated therein "are true and correct." Decl. RS (Pls.' Ex. A, ECF No. 94-3). This is a novel way to present summary judgment evidence. But the Court will consider the facts within the response as true and correct to the extent it can find that the information is made on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4). Although Exhibit A does not itself show the declarant to be competent to testify on the matters stated as required by Rule 56(c)(4), a second declaration from the same declarant (Pls.' Ex. I, ECF No. 94-11) shows his competency to testify on the matters. While the Court accepts facts presented in the response, the better practice would be to directly support them with a declaration or affidavit from RS instead of the method used here.

[8] There is no dispute that Plaintiffs claim that predecessors in interest obtained three registrations, including for TRAN-TOOL and ATEC TRANS-TOOL, but the predecessors abandoned the marks. *Compare* SAC ¶¶ 18-19 *with* Mot. at 2. Viewing the evidence in the light most favorable to Plaintiffs, the Court will proceed as though Plaintiffs are one and the same as their predecessors in interest. In other words, whether the Court refers to Plaintiffs collectively or individually, the reference also includes their predecessors in interest. The Court will not continually mention the predecessors.

4

if they know it's a T number, they knew it was Trans Tool." *Id.* 110:15-18.

According to Plaintiffs' response, consumers in the transmission repair business have come to recognize Plaintiffs' Unregistered Marks with Trans Tool's line of transmissions repair tools. But the second declaration of RS only mentions this recognition with respect to the parts number-ing system. *See* Decl. RS ¶ 5. "Although Trans Tool sells directly to customers," it sells many of its tools "through distributors, who market and sell the . . . tools using the TRANS TOOL mark, ATEC mark, and the T-xxx parts numbering system." *Id.* ¶ 6. GAT has been a distributor for Trans Tool. *Id.* ¶ 7. Other distributers of Plaintiffs include Transtar, E Tool World, Cobra Transmissions, and Automatic Transmission Group. Dep. RS 75:9-17, 100:8-12, 101:11-15, 104:18-19, 105:25-106:5, 121:18-20. When a distributor buys tools from Trans Tool, they are given "the right to use the T dash number" designation system. *Id.* 101:19-23.

In 2015, Transtar began using tools obtained from ASG. Sealed Dep. Fischer 18:11-15. A technical person with Transtar viewed ASG's tools as suitable replacements. *Id.* 18:16-22. It did not know where ASG obtained the tools. *Id.* 18:23-25. Transtar used the same part designation system whether it purchased the tools from Plaintiffs or ASG. *Id.* 26:2-19. While ASG was its supplier, Transtar did not advise customers that the T-1503 or T-1574 were made in China, because it did not know their origin. *Id.* 34:17-22.

In 2019, Transtar approached Plaintiffs about obtaining a discount on the two tools in ques-tion because their price was high compared to what Transtar was then paying others. *Id.* 63:15-19. According to RS, Transtar switched back to Plaintiffs' products because "they were not going to bring more product in from China." Dep. RS 104:17-18. After that switch, any purchase of a T-1574 from Transtar would be Plaintiffs' product. *Id.* 104:18-19.

Historically, Kent and Trans Tool used different part numbering systems; thus, even though they sold the same parts, their parts were identified differently. *See* Sealed Dep. Fischer 38:2-10;

Dep. Fischer 25:8-20. When Transtar communicated with Kent, it used Kent's part numbers. Sealed Dep. Fischer 63:3-4. Even after the purchase of Kent, Bosch has used different numbers. *See* Dep. RS 143-14-15.

In sum, before the events leading to this litigation, only two entities (Trans Tool and Kent) supplied the tools, but they catered to different markets. Kent sold mostly to automobile dealerships, not to the aftermarket like Trans Tool, and sells its installers at a higher price point than Trans Tool. Kent does not use the Parts Designation System.

**D. Events Leading to Litigation**

An invoice dated June 12, 2014, shows that GAT purchased a T-1574-M from Trans Tool for $111.97, and had it sent to DF. *See* ECF No. 94-7 (Pls.' Ex. E). In addition to typed information, the invoice contains four handwritten notations – two dates in November 2015, a remark near the shipping recipient ("Blind shipment to All State Gear"), and a statement that this was "Last time Grade A Tool purchased a T-1574-M from Trans Tool." *See id.*

The events leading to this litigation essentially commenced when JF approached ASG to see if it had a source to manufacture T-1503 and T-1574. *See* Dep. JF 31:14-24. More particularly, GAT asked DF to source a tool designated as T-1503. Sealed Dep. DF 38:15-20. They talked about sourcing that tool and T-1574. *Id.* 39:1-6. They began talking about sourcing the tools in 2014 or 2015. *Id.* 40:17-23. JF testified that in 2014 he outsourced the manufacture of the relevant tools to a provider recommended by his brother. Dep. JF 31:14-32:15. DF agreed that the two had discussed outsourcing the tools. *See* Sealed Dep. DF 40:17-22.

GAT sent ASG samples of tools from Trans Tool. Dep. JF 86:15-25; 87:22-23. It did so to obtain guides, purportedly to make the tools better. *Id.* 87:24-88:21. ASG then shipped those samples to a source in China. Sealed Dep. DF 48:3-6; 61:5-10. Chinese product codes JJ-146 and JJ-148 correlate to the T-1503 and T-1574 sent for outsourcing. *See id.* 61:20-23; Pls.' Sealed Ex. M

6

(ECF No. 94-15) (showing correlation between the part numbers). Once DF received a Chinese sample, he obtained approval from JF to proceed with the sourcing. Sealed Dep. DF 139:7-20. At this point, the Faulkner brothers and their companies started working together to manufacture and sell both tools at issue in this case.

ASG was solely responsible for all communications and orders with the Chinese agent. Dep. JF 32:11-21; Sealed Dep. DF 52:8-24.The first sale of outsourced tools related to this case occurred on October 1, 2014. Dep. JF 130:7-13. After his brother obtained the tools from his source, JF would buy them all. *Id*. 96:12-23. But he agreed to sell some outsourced tools to ASG at a reduced cost. *Id*. 98:1-21. GAT and ASG appear to have marketed and sold Chinese manufactured T-1503s and T-1574s through December 2019. *Id*. 130:21-25 (showing date but witness did not have documentation to verify); 140: 10-20 (showing documentation for sales between October 1, 2014, and December 31, 2019).

As stated by RS, Trans Tool used the tools "for 20 some-odd years until [ASG] copied it." Dep. RS 166:21-22. ASG "copied my tool; they copied my tool number; they copied and lowered the price, had them brought in [from] China, and came over here and lowballed the price by about 70 percent." *Id*. 167:3-8. More specifically,

> They are using -- they copied my tool, they use my name as the seller -- or the manufacturer of the tool, and they misrepresent my line and my product. And they copied it in China, brought it over here, dropped the price by 70 percent, took my biggest customer away, Transtar Industries. And I don't know whether they talked them into using the same tool number there or not, but Transtar didn't change the number and they're representing it as a Trans-Tool.

*Id*. 100:4-12.

RS testified that using the same part designation for tools obtained from different vendors would be confusing to consumers. Dep. RS 85:1:4. He explained with an example:

> say for 20 years Transtar is buying my 1574 and 1503 and selling it under a T dash 1503 and 1574 and then all of the sudden in 2015 they take on the Chinese one but they don't change the name, they don't change the part number or anything like

that, they still have it as showing as a T-1574, and you have your Grade A Tool and
you have other suppliers of them showing my name as the manufacturer and selling
it on the on the internet for a lot less, yeah, that's -- I would say they -- they -- they
tried to take advantage of me.

*Id*. 85:5-14. While Transtar purchased tools from defendants, Transtar "used my T numbers; they

didn't change them. They changed product lines but didn't change my number -- change the num-

bers and notified anybody that it is a different manufacturer and made in China." *Id*. 111:5-9. RS

informed Transtar via email that, if it is purchasing the T-1503 or T-1574 "from another supplier,

they are not US made, they come from China." *Id*. 115:6-8. Plaintiffs' products are made in the

United States. *See id*. 116:4-10.

These events resulted in this litigation. ASG has now moved for summary judgment on all

claims. The motion is fully briefed and ready for ruling. But before addressing the merits of this

substantive, dispositive motion, the Court revisits the summary judgment exhibits that have been

sealed in this case.

## II. SEALED EXHIBITS

As a preliminary matter, the Court considers Plaintiffs' reliance on seven exhibits filed

under seal. After Plaintiffs filed an unopposed motion to file the exhibits under seal because para-

graph 12 of the Agreed Protective Order (ECF No. 36) entered in this case directs parties to file

certain information under seal, *see* ECF No. 95 (sealed unopposed motion), the assigned Magis-

trate Judge granted the motion by text order without further explanation.

The Court first notes that, in all material respects, paragraph 12 of ECF No. 36 parallels

paragraph 13 of the Western District's standard "Confidentiality and Protective Order" attached

as Appendix H-1 to the civil local rules. However, paragraph 13 of the standard protective order

also includes the following language omitted from ECF No. 36: "Nothing in this Order shall limit

the parties' rights or ability to offer evidence at a hearing or trial. The manner of using any Confi-

dential information at a hearing or trial and the status of Confidential information resulting from

any such use will be determined by the court."

The omission of that language from the Agreed Protective Order is essentially immaterial. With or without the first omitted sentence, a protective order is not sufficient generally to limit a party's rights or ability to offer evidence at a hearing or trial. Similarly, the second sentence merely states a legal truism that cannot be avoided by consent of the parties through an agreed protective order. With or without the additional language of paragraph 13, protective orders like the agreed one entered in this case do not justify sealing documents merely because they are within the scope of the protective order. Like the standard protective order, the Agreed Protective Order makes any sealing contingent on the sealing requirements of the court.

And those sealing requirements are "far more arduous" than merely obtaining a protective order on good cause shown. *See June Med. Servs., LLC v. Phillips*, 22 F.4th 512, 521 (5th Cir. 2022). Although certain exhibits have been sealed in this case, the Court questions the broad sealing of documents and finds nothing in the sealed documents that warrant sealing entire exhibits. But there does appear to be adequate reason to seal portions of submitted exhibits. The local rules of this Court make clear that (1) only "limited circumstances" warrant filing documents under seal, (2) motions to seal "are disfavored," (3) parties are expected "to draft such submissions in a manner that does not disclose confidential information," and (4) redaction is urged as a viable alternative. *See* W.D. Tex. Civ. R. 5.2.

In *June Medical Services*, furthermore, the Fifth Circuit recently reaffirmed the importance of the Court's role in assuring that parties do not infringe upon the public's right to access judicial documents. *See* 22 F.4th at 519-21. The undersigned completely and emphatically agrees with the following statements from a sister court:

> The Court takes very seriously its duty to protect the public's access to judicial records. Transparency in judicial proceedings is a fundamental element of the rule of law—so fundamental that sealing and unsealing orders are immediately appealable under the collateral-order doctrine. The public's right to access judicial records

> is independent from—and sometimes even adverse to—the parties' interest. That's
> why the judge must serve as the representative of the people and, indeed, the First
> Amendment, in scrutinizing requests to seal.

*Carter v. Sw. Airlines Co.*, No. 3:17-CV-02278-X, 2022 WL 283025, at *1 (N.D. Tex. Jan. 31,

2022) (citations and footnotes omitted).

Whether to seal a filing lies within the discretion of the court. *See June Med. Servs.*, 22

F.4th at 519. Unquestionably, "litigants sometimes have good reasons to file documents (or por-

tions of them) under seal, such as protecting trade secrets or the identities of confidential inform-

ants." *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 419 (5th Cir. 2021). When deciding to seal

a submission, "the court must undertake a document-by-document, line-by-line balancing of the

public's common law right of access against the interests favoring nondisclosure." *June Med.*

*Servs.*, 22 F.4th at 521 (citations and internal quotation marks omitted). Furthermore, "the working

presumption is that judicial records should not be sealed." *Id.* (quoting *Le*, 990 F.3d at 419). And

"courts should be ungenerous with their discretion to seal judicial records." *Le*, 990 F.3d at 418.

When "sealing is necessary, it must be 'congruent to the need.'" *June Med. Servs.*, 22 F.4th at 521

(quoting *Le*, 990 F.3d at 420).

While "judges, not litigants" are tasked with determining whether to seal a document and

that task ultimately requires them to undertake the case-by-case, document-by-document, and line-

by-line balancing of the public's right of access against presented interests favoring nondisclosure,

*see Le*, 990 F.3d at 419, it is certainly within a court's discretion to summarily deny a request to

seal when it is apparent that the submitter has not conducted its own document-by-document, line-

by-line review. Litigants and others seeking secrecy have the burden to overcome the strong pre-

sumption favoring public access. *See BP Expl. & Prod., Inc. v. Claimant ID 100246928*, 920 F.3d

209, 211 (5th Cir. 2019). They "must explain in particularity the necessity for sealing." *Id.* And

this may require them to address the submitted sealed documents on the same line-by-line basis

that the courts must ultimately apply.

When a case "involves matters of particularly public interest," courts may require a greater showing to overcome the access presumption. *June Med. Servs.*, 22 F.4th at 520 (citations, internal quotation marks, and brackets omitted). Examples of when such a greater showing applies include when "one of the parties is a public official or party of a public nature" or when "misspent government funds" are at issue. *See Bradley ex rel. AJW v. Ackal*, 954 F.3d 216, 233 (5th Cir. 2020).

This case does not warrant requiring a greater showing than normal. But Plaintiffs still remain far from satisfying their burden. Here, Plaintiffs filed an unopposed motion to file documents under seal. *See* ECF No. 95. Nothing in the motion exhibits any line-by-line review and Plaintiffs rely solely on the Agreed Protective Order for sealing the documents. This is simply insufficient, and a stated agreement or a lack of opposition does not matter. "It is the public that has the right of access, so private litigants should not be able to contract that right away." *BP Expl.*, 920 F.3d at 211. An agreement between the parties regarding sealing does nothing to carry the movant's burden on the motion. "The secrecy of judicial records, including stipulated secrecy, must be justified and weighed against the presumption of openness that can be rebutted only by compelling countervailing interests favoring nondisclosure." *Le*, 990 F.3d at 421.

Courts may sua sponte revisit a sealing order. *See June Med. Servs.*, 22 F.4th at 518 n.3. It is "most disquieting" when "documents marked confidential" are submitted under seal in the context of summary judgment, "a dispositive order adjudicating the litigants' substantive rights (essentially a substitute for trial)," without even a "mention of the presumption in favor of the public's access to judicial records." *Le*, 990 F.3d at 420 (last quotation attributed to *SEC v. Van Waeyenberghe*, 990 F.2d 845, 849 (5th Cir. 1993)). Circumstances such as this may warrant revisiting the sealing order. "All too often, judicial records are sealed without any showing that secrecy is warranted or why the public's presumptive right of access is subordinated. This mistake harms the

public interest, however interested the public is likely to be." *Id.* at 421.

Given the insufficient reason proffered for sealing Plaintiffs' Exhibits J through P in this case, the Court revisits the sealing order and reviews the sealed documents in accordance with *June Medical Services*. If this was the original ruling on the motion, the Court might simply deny the motion and direct the Plaintiffs to try again after conducting their own line-by-line analysis. But this is not the original ruling, and the case has proceeded to this point with the exhibits being under seal. Thus, the Court will not have Plaintiffs simply try again. Nor will it disregard the exhibits or treat them as entirely public. It instead conducts its document-by-document, line-by-line analysis hindered somewhat by Plaintiffs' lack of sufficient reasoning for sealing the exhibits.

Exhibit J (ECF No. 94-12) is deposition testimony from DF as corporate representative of ASG. *See* Sealed Dep. DJ 22:9-20. He invoked privilege for some information provided. *Id.* 48:20-25, 139:25. At one point he stated he wanted his brother, JF, to leave the deposition due to confidentiality. *Id.* 52:11-13. DF identified a confidential source for some of his products and the source was referenced several times. *See id.* 61:8-9; 62:1, 62:11; 63:16-17; 63:19. DF also identified his confidential interpreter used for his China connection. *See id.* 147:8; 147:22; 148:17; 149:23; 150:25. The Court finds no reason to seal this exhibit. Although nothing in this case warrants disclosure of the names of the confidential source or interpreter, their names are irrelevant to the issues in this case and their confidentiality may be secured through proper redaction of the deposition excerpts rather than sealing the exhibit.

Exhibit K (ECF No. 94-13) is deposition testimony from Fischer. The Court likewise finds no reason to seal this exhibit. While there may be discussion of confidential business matters, only one sentence was designated as confidential at the deposition, *see* Sealed Dep. Fischer 70:9-19, and that sentence is irrelevant to the issues in this case. Confidentiality of the single sentence, *see id.* 70:11-13, may be secured through proper redaction. A method of securing confidentiality that

should be the first step for litigants. *See* W.D. Tex. Civ. R. 5.2(b).

Exhibit L (ECF No. 94-14) shows a number of phone messages. Other than disclosure of non-public customers and their contact information, *see* ECF No. 94-14 at 11, 13, 18, and 20, the Court sees no information within this exhibit that might warrant filing it under seal. Nevertheless, the private customer information is not relevant to this litigation and its privacy may be secured through redaction.

As discussed in the background section, Exhibit M (ECF No. 94-15) is a summary of purchase orders from ASG by GAT. It connects the Chinese part numbers with those used by GAT but does not reveal pricing information or any customer information. The Court finds no basis to seal this exhibit.

Exhibit N (ECF No. 94-16) shows that GAT purchased various tools with the Chinese part numbers. Although the document reveals some customer information of GAT itself, the fact that GAT is a customer of ASG is not confidential information within the context of this case. However, the document may reveal non-public pricing information between the brothers. To that extent, the invoice may contain confidential information that should be redacted. But with such redaction, the Court finds no reason this exhibit should be filed under seal.

Exhibit O (ECF No. 94-17) is a parts list showing part numbers for Chinese products, their prices, and quantities ordered. The part numbers are within other unsealed submitted evidence and are thus now within the realm of public knowledge. That alone makes it improper to seal such information from the public. *See June Med. Servs.*, 22 F.4th at 520 ("Publicly available information cannot be sealed."). The pricing information is confidential. But it is also irrelevant to this lawsuit and could have been easily redacted to avoid any issue with sealing the document. Given the preference for redaction versus sealing and the ability to redact the only arguable information that might be sealed from public access, the Court finds no basis to seal this exhibit.

Exhibit P (ECF No. 94-18) is primarily a collection of invoices and purchase orders (collectively referred to as invoices), some of which contain confidential customer information. To the extent the invoices address purchases between parties or former parties to this litigation, the Court sees no reason to seal the invoices from the public even with the customer information. The fact that ASG and GAT were customers of one another is a matter of public record. On the other hand, some invoices reveal nonpublic information of other customers that could and should be redacted rather than filed under seal. To the extent the invoices contain non-party customer information, such as names and addresses, the information is irrelevant to the proffer in this case.

For the most part, the invoices appear to show only public pricing information which provides no basis to seal any aspect of the exhibit. But, if the pricing information is shown to be private and relevant, then the nature of this case does not favor public access. In the context of this case, it is proper to seal an invoice that shows private and relevant pricing information. On the other hand, if pricing information is irrelevant to this litigation, the best course is to redact it from the exhibit.

Although sua sponte revisiting a prior sealing order may not be mandated, the circumstances of this case warrant such review. And for the foregoing reasons, the Court directs Plaintiffs to file properly redacted exhibits consistent with the findings of the Court. They shall file the redacted exhibits within fourteen days after the entry of this Memorandum Opinion and Order. To the extent any invoice or purchase order in Exhibit P shows private and relevant pricing information, Plaintiffs (or the provider of private information) shall instead provide sufficient information, within that same deadline, for the Court to determine whether such an invoice should be filed under seal. Failure to comply with these deadlines may result in the impositions of sanctions including a monetary sanction payable to the Court. Because the Court has ordered Plaintiffs to file redacted versions for public access, it will maintain the original exhibits filed under seal to

reflect the full record.

Although the Court appreciates that litigants often seek to seal confidential documents received from their adversaries or nonparties, appropriate redaction rather than sealing is the preferred means of achieving privacy balanced with the public's right of access. And while an issued protective order may justify secrecy outside the adjudicative process, once a party presents matters for resolution through the adjudicative process, the party must satisfy the more arduous standard for making a filing under seal. With this preliminary matter resolved, the Court now proceeds to the substantive matters presented through the instant motion for summary judgment.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment on an affirmative defense, the movant "must establish beyond

peradventure" each essential element of the defense. *Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

## IV. AFFIRMATIVE DEFENSES

ASG asserts the following affirmative defenses in its motion for summary judgment: (1) nominative fair use; (2) laches; and (3) acquiescence. *See* Mot. at 17-19. Plaintiffs urge the Court to not consider the defenses asserted in the pre-answer motion but also argue in the alternative that the defenses fail in any event because Defendant has not conclusively shown applicability of any defense. *See* Resp. at 16-20.

### A. Waiver

Determining whether a party has waived an affirmative defense lies within the sound discretion of the Court. *See Mot. Med. Techs., LLC v. Thermotek, Inc.*, 875 F.3d 765, 771 (5th Cir. 2017) (applying abuse of discretion to such determinations). And, while a defendant may waive

an affirmative defense when it fails to comply with Fed. R. Civ. P. 8(c) by stating its "affirmative defenses in its responsive pleading," technical failures to comply are not necessarily fatal. *Id.* Waiver may be avoided when "(1) the defendant raised the affirmative defense 'at a pragmatically sufficient time, and (2) the plaintiff 'was not prejudiced in its ability to respond.'" *Id.* (quoting *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986)).

First, ASG complied with Rule 8(c) by asserting its affirmative defenses in their first responsive pleading. *See* Orig. Answer (ECF No. 90) ¶¶ 64-66. It was merely a quirk of this case, that the first responsive pleading followed ASG's summary judgment motion. And even if the Court were to find a technical non-compliance by first raising the defenses in a motion for summary judgment, Plaintiffs still received fair notice of the defenses. Because they learned of the defenses "at a pragmatically sufficient time and suffered no prejudice," there is no abuse of discretion in finding no waiver under the circumstances. *See id.* at 771-72 (finding no abuse of discretion in similar circumstances). The Court thus addresses whether the asserted defenses entitle ASG to summary judgment.

**B. Nominative Fair Use**

"The nominative fair use doctrine provides that 'one who has lawfully copied another's product can tell the public what he has copied.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 488 (5th Cir. 2008) (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 545 (5th Cir. 1998) *abrogation on other grounds recognized by Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 356 (5th Cir. 2002) (discussing test of functionality after *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001))). The doctrine "also permits one to 'use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product." *Id.* (quoting *Pebble Beach*, 155 F.3d at 546). But one exceeds a nominative use when use of a mark "creates a

likelihood of confusion as to source, sponsorship, affiliation, or approval." *Id*. (same).

The doctrine only provides a defense when the defendant has (1) only "use[d] so much of the mark as necessary to identify the product or service and (2)" has not done "anything that suggests affiliation, sponsorship, or endorsement by the markholder.'" *Id*. at 489 (same). Because the Fifth Circuit has recognized that "alleged nominative fair use should usually be considered along with the likelihood-of-confusion analysis," *see id.*, the Court will further consider this defense in that context.

## C. Laches

"Laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." *Elvis Presley Enters, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985)). To establish this defense, one must show "(1) a delay in asserting a right or claim; (2) that the delay was inexcusable; [and] (3) that undue prejudice resulted from the delay." *Id*. (quoting *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir. 1982)). The critical "time period begins when an owner of a mark first has knowledge of the accused use." *Id*. And the Fifth Circuit has adopted an "objective standard of 'knew or should have known' [as] a logical implementation of the duty to police one's mark." *Id*. The law, furthermore, does not distinguish "between inexcusable delay in obtaining knowledge of infringing activity and inexcusable delay after obtaining such knowledge." *Id*. (emphasis omitted).

ASG provides a declaration of its owner averring that RS knew that ASG was using the T-1574 and T-1503 designations since mid-2015. *See* Decl. DL ¶¶ 3-4. Plaintiffs submit a declaration from RS that he did not learn of ASG's use of the relevant marks until September 2019. *See* Decl. RS ¶ 10. Given these competing declarations regarding the first element of the laches defense, ASG has not established the defense and thus cannot obtain summary judgment based on the

defense. For this element, there is at least a genuine dispute of material fact as to when Plaintiffs knew of ASG's use. ASG, furthermore, points to no evidence to establish the prejudice element.

## D. Acquiescence

"Similarly, acquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant." *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985). The "acquiescence defense requires the defendant to establish three elements: (1) assurances by the plaintiff that the defendant could use the mark, (2) reliance by the defendant upon those representations, and (3) undue prejudice." *Pennzoil-Quaker State Co. v. Miller Oil & Gas Ops.*, 779 F.3d 290, 294 (5th Cir. 2015). Acquiescence involves either "implicit or explicit assurances to the defendant which induces reliance by the defendant." *Id.* (quoting *Conan Props.*, 752 F.2d at 153). Silence may constitute an implicit assurance. *See Elvis Presley Enters, Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998).

The parties rely on the same evidence to support/oppose this defense. ASG expressly relies on the silence of Plaintiffs as an implicit assurance. *See* Mot. at 19. But the duration of any silence appears critical to whether it can reasonably be considered as an implicit assurance and as to whether ASG relied upon such an implicit assurance. Given the genuine dispute of material fact as to when Plaintiffs knew of the alleged infringing activities, ASG has not carried its burden to establish the defense at this juncture. ASG, furthermore, does not point to any evidence of undue prejudice. For these reasons, this defense does not entitle ASG to summary judgment.

## V. SUBSTANTIVE CLAIMS

Plaintiffs assert four claims, all related to alleged infringement of their Unregistered Marks (TRANS TOOL, the Parts Designation System, and ATEC): (1) false designation of origin and unfair competition under 15 U.S.C. § 1125(a); (2) common law trademark infringement; (3) common law unfair competition; and (4) civil conspiracy. SAC ¶¶ 9-15, 36-61.

**A. Lanham Act**

Plaintiffs assert claims for false designation of origin and unfair competition under 15 U.S.C. § 1125(a) of the Lanham Act. *See* SAC ¶¶ 36-45. They premise the claims on ASG's use of the marks: TRANS TOOL, ATEC, or the Parts Designation System. *See id*. ¶ 38. They contend that such use constitutes (1) "false and misleading descriptions and/or representations of fact which are likely to cause confusion, mistake or deception as to the affiliation, connection of association of [ASG's] goods with those of the Plaintiff" and (2) "a false designation of origin, or a false description or a false representation as to the source of [ASG's] goods so that the purchasing public in this market may mistakenly believe that the automobile repair tools of [ASG] are in fact provided, or authorized by Plaintiffs." *Id*. ¶¶ 41-42.

ASG asserts that, not only do Plaintiffs lack a protectible interest in the marks, but it did not use either of the ATEC or TRANS TOOL marks. Mot. at 4. It further asserts that Plaintiffs cannot show that (1) it made any false statement of fact about any product, (2) any statement deceived or had the potential to deceive a substantial segment of potential customers, or (3) they have been or are likely to be injured as a result of any statement made. *Id*. at 4-5. As already discussed to some extent, ASG also asserts the fair use doctrine as a defense. *Id*. at 17.

**1. General Lanham Act Principles**

Nearly eight decades ago, "Congress enacted the Lanham Act." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014). While the Act (codified as 15 U.S.C. §§ 1051-1141n) primarily concerns trademark protection, it "creates a federal remedy 'that goes beyond [such] protection." *Id*. at 107 (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003)). In pertinent part, § 43(a) of the Lanham Act provides:

> Any person who . . . uses . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin,

> sponsorship, or approval of his or her goods, services, or commercial activities by
> another person . . . shall be liable in a civil action by any person who believes that
> he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (format changed to reflect a single paragraph). This provision "provides a cause of action for infringement of an unregistered mark." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.8 (5th Cir. 2010). But it is not limited to mere trademark infringement. *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distribution Co.*, 520 F.3d 393, 399 (5th Cir. 2008) (citing *Dastar*). Courts broadly construe this "remedial statute" to apply it "to situations in which a registered trademark is not involved." *Id.* (quoting *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996) for first quote and citing cases regarding second quote).

## 2. Infringement Claims

To succeed on a Lanham Act infringement claim, plaintiffs must "establish ownership in a legally protectible mark, and second, . . . show infringement by demonstrating a likelihood of confusion." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010) (quoting *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)). A "trademark" under the Lanham Act "may be 'any word, name, symbol, or device, or any combination thereof' that is used or intended to be used 'to identify and distinguish' a person's goods 'from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (quoting 15 U.S.C. § 1127).

Whether a mark is protectible does not depend on whether it is registered and the protectability of unregistered marks is "governed generally by the same principles that qualify a mark for registration under the Lanham Act." *Id.* Thus, as the Supreme Court stated thirty years ago, to be protectible, "a mark must be capable of distinguishing the applicant's goods from those of others." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). In general, marks are "classified

in categories of generally increasing distinctiveness . . . they may be (1) generic; (2) descriptive;
(3) suggestive; (4) arbitrary; or (5) fanciful." *Id*.

If a mark qualifies as any of the latter three categories, it is "deemed inherently distinctive
and [is] entitled to protection" because its "intrinsic nature serves to identify a particular source of
a product." *Id*. At the other end of the spectrum lie generic marks that are not protectible. *Id*.
Somewhere between the inherently protectible and inherently unprotectible lie marks that "are
merely descriptive of a product" and "not inherently distinctive." *Id*. at 769. While these latter
marks are not initially protectible, they "may acquire the distinctiveness which will allow them to
be protected under the Act" through a concept known as "secondary meaning." *Id*. Courts have
applied the secondary meaning concept in actions under § 43(a). *See id*.

"Secondary meaning occurs when, in the minds of the public, the primary significance of
a mark is to identify the source of the product rather than the product itself." *Smack*, 550 F.3d at
476 (citation, internal quotation marks, and brackets omitted). This inquiry considers "the public's
mental association between the mark and the alleged mark holder." *Id*. A secondary meaning is
acquired through use of a mark that becomes "uniquely associated with a specific source." *Id*.
(citation omitted). Courts apply a multi-factor test to determine whether a mark has obtained a
secondary meaning, including

> (1) length and manner of use of the mark . . . (2) volume of sales, (3) amount and
> manner of advertising, (4) nature of use of the mark . . . in newspapers and maga-
> zines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the
> defendant's intent in copying the [mark].

*Id*. (citation omitted). Each factor alone does not need to prove secondary meaning so long as the
"factors in combination . . . show that consumers consider a mark to be an indicator of source." *Id*.

Regarding distinctiveness, the general rule "is clear: An identifying mark is distinctive and
capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness
through secondary meaning." *Two Pesos*, 505 U.S. at 769. Furthermore, "eligibility for protection

22

under § 43(a) depends on nonfunctionality." *Id*. And, of course, it is "also undisputed that liability under § 43(a) requires proof of the likelihood of confusion." *Id*. "Although the secondary meaning of a mark and the likelihood of confusion are ordinarily questions of fact," granting summary judgment may be warranted when "the summary judgment record compels the conclusion that the movant is entitled to judgment as a matter of law." *Smack*, 550 F.3d at 488 (citation and footnote omitted).

Because one can show a § 43(a) violation without proof of trademark infringement, *see Schlotzsky's*, 520 F.3d at 399-400, whether Plaintiffs have a protectable mark is not necessarily fatal to the entirety of their Lanham Act claim.

### 3. Noninfringement Claims

To succeed on a noninfringement claim under the Lanham Act, a plaintiff "must demonstrate" five elements. *King v. Ames*, 179 F.3d 370, 373-74 (5th Cir. 1999) (listing five elements). These are the same five elements required to succeed on a false advertising claim under § 1125(a)(1)(B) of the Lanham Act. *See IQ Prod. Co. v. Pennzoil Prod. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (listing same five elements).

Stated generally, the first element requires a "false or misleading statement of fact." *See id*. But the statute makes clear that such statement of fact may be satisfied by showing that the defendant made either a "false designation of origin" or a "false or misleading description" or representation of fact. *See* 15 U.S.C. § 1125(a). A statement that is true-but misleading may satisfy this element. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000). Similarly, the statements satisfying element one must either deceive, or have "the potential to deceive, a substantial segment of potential customers." *King*, 179 F.3d at 374; *accord IQ Prod.*, 305 F.3d at 375. The requisite deception includes a likelihood to cause confusion or mistake. *See* 15 U.S.C. § 1125(a). Third, to be actionable, any deception must be "material, in that it is likely to influence

the consumer's purchasing decision." *IQ Prod.*, 305 F.3d at 375; *accord King*, 179 F.3d at 374. Fourth, the goods, services, or commercial activities must be "in interstate commerce." *IQ Prod.*, 305 F.3d at 375; *accord King*, 179 F.3d at 374 (stating that the defendants must have "caused their products to enter interstate commerce"). Fifth and finally, "as a result of the statement at issue," there must be an injury to the plaintiff or the plaintiff "is likely to be injured." *IQ Prod.*, 305 F.3d at 375; *accord King*, 179 F.3d at 374.

"If the statement at issue is shown to be literally false, the court must assume that it actually misled consumers, without requiring any evidence of such deception from the plaintiff." *IQ Prod. Co.*, 305 F.3d at 375. In other words, for "literally false" statements, the second and third elements are satisfied. But if the plaintiff merely shows the statement "to be misleading, the plaintiff must also introduce evidence of the statement's impact on consumers, referred to as materiality." *Pizza Hut*, 227 F.3d at 495. Stated differently, if the plaintiff merely shows the statement "to be misleading or ambiguous," then "the plaintiff must demonstrate actual deception through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests." *IQ Prod. Co.*, 305 F.3d at 375.

### 4. Use of Unregistered Marks

As ASG properly argues, Plaintiffs present no evidence that ASG used the ATEC or TRANS TOOL marks in its marketing or sale of tools. *See* Reply at 5. Because Plaintiffs partially premise their Lanham Act claims on such use, their claims fail as to these two marks absent evidence that ASG used the marks. This is true whether Plaintiffs pursue an infringement or noninfringement claim. As to the first element of a noninfringement claim, Plaintiffs must show that ASG used a false designation of origin or a false or misleading description of fact or representation of fact. Lack of use of these marks necessarily defeats this claim under the facts of this case. And as to both infringement and noninfringement claims in this case, there can be no likelihood of

confusion absent use of a mark.

Viewed in the light most favorable to Plaintiffs, the evidence shows that ASG hired a Chinese source to manufacture imitations of Plaintiffs' tools. But the evidence identified by Plaintiffs to show that ASG used each of the three marks comes up short. To support their position that ASG used each of the marks at issue in this case to market and sell imitation tools to consumers, Plaintiffs identify deposition testimony from JF and Exhibits F; G; H, N; O; and P. *See* Resp. at 10 & n.56. The Court considers each item of this evidence in turn.

Testimony from JF shows that he approached ASG to find someone to outsource tools. Dep. JF 31:14-32:10. He further testified that he sold ASG tools with the Unregistered Marks. *Id*. 117:20-118:14. He also stated that GAT used the Unregistered Marks. *Id*. 180:20-181:8. But no identified testimony from JF shows that ASG used any of the marks other than privately obtaining a Chinese source to manufacture the tools. No identified testimony shows that ASG made any false or misleading statement of fact. The cited testimony does not show that ASG made any false designation of origin or any false or misleading description or representation of fact. Nor does it show that ASG used any marks at issue in this case.

Plaintiffs' Exhibits F and G simply show use by GAT, with one instance of an ebay posting by Tools for Sale without connecting that entity to ASG. And RS testified that he was merely speculating that Tools for Sale was obtaining the product from ASG. Dep. RS 138:18-139:7. Exhibit O is merely a document produced by GAT to connect the Chinese part numbers with the tools at issue in this case. Exhibit N shows that GAT purchased tools with the Chinese part numbers.

Exhibit P primarily contains a series of invoices and purchase orders between ASG and GAT, but also includes an email chain related to a customer ordering the wrong item from GAT. The email chain does not show ASG using any mark of Plaintiffs. Invoices from ASG merely show GAT purchasing tools with Chinese part numbers. GAT purchase orders show GAT ordering tools

in the format GAT-T-xxxx from ASG. But these purchase orders do not show ASG necessarily using those same product numbers. And, finally, invoices from GAT show purchases by ASG and other customers of tools with the ATEC, Trans Tool, and T-xxxx marks. But the invoices reflect how GAT, rather than ASG, identifies the tools.

Exhibit H, on the other hand, shows ASG's website using T-1503 and T-1574 tool designations. So, unlike the ATEC and TRANS TOOL marks, the evidence indeed shows that ASG used the T-xxxx mark or parts designation system.

With respect to the ATEC and TRANS TOOL marks, Plaintiffs' Lanham Act claims fail because ASG has carried its summary judgment burden by asserting that no evidence shows that it used those marks. Plaintiffs have failed to identify any evidence to create a genuine dispute of material fact as to such use. Consequently, as to the ATEC and TRANS TOOL marks, ASG is entitled to summary judgment. As to these marks, there is no need to address other elements of the Lanham Act claims, including whether ATEC and TRANS TOOL qualify as protectible marks.

However, with respect to the Parts Designation System, Plaintiffs have presented evidence to show that ASG used that system in its advertising and marketing. The Court thus proceeds to other elements of the Lanham Act claims as to the T-xxxx mark.

### 5. Secondary Meaning of T-xxxx Mark

Plaintiffs have presented facts to at least create a genuine dispute as to whether the Parts Designation System acquired a secondary meaning and is thus protectible under the Lanham Act. Viewing the summary judgment evidence in the light most favorable to Plaintiffs, the T-xxxx product designations are more than generic marks. There is evidence that Trans Tool had significant volume of sales and committed to the mark in the amount and manner of its advertising. For many years, furthermore, the numerical designation reflected only parts/tools supplied by Plaintiffs and manufactured in the United States.

While there may be evidence that the T-xxxx numbering system merely described the specific tool without acquiring any secondary meaning as to being American-made tools supplied by Plaintiffs, *see* Dep. Fischer 53:22-54:13; 55:8-18, that evidence does not preclude a secondary meaning and other evidence supports a secondary meaning for the parts designation system. For instance, although Kent sold the same tools, it used a different system to identify its tools. There is also evidence that only distributors of Plaintiffs' tools used the T-xxxx system until the defendants in this action began using the same identification on tools manufactured in China and not supplied by Plaintiffs. Thus, the fact that there are different companies in the automotive industry selling the T-1574 and T-1503 tools is not necessarily indicative of a generic or non-protected mark.

Plaintiffs have presented evidence to show that the T-xxxx numbering system reflects products supplied by Plaintiffs and manufactured in the United States. Viewing the evidence through the summary judgment lens, ASG's use of that system to identify products not supplied by Plaintiffs and not manufactured in the United States qualifies as a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact" within the meaning of 15 U.S.C. § 1125(a).

### 6. <u>Functionality</u>

Defendant argues that Plaintiffs cannot protect the T-xxxx designation under the Lanham Act because the designation serves a functional purpose. Mot. at 11. Indeed, "[a] product feature that is functional does not qualify for protection under the Lanham Act." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 485 (5th Cir. 2008). Furthermore, Plaintiffs have "the burden of establishing nonfunctionality" as they are the ones "seeking protection under the Lanham Act." *Id*.

There are two recognized "tests for determining functionality." *Id*. The traditional test asks

whether "the product feature is the reason the device works." *Id*. at 486 (citation and internal quotation marks omitted). If the answer is yes, "then the feature is functional." *Id*. (same). Here, because the T-xxxx designation has nothing to do with whether the device works, Plaintiffs pass the traditional test. Under the second test, known as "the competitive necessity test," the question is whether the "functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage." *Id*. (same). Here, the T-xxxx designation is not a functional feature of the tool. Evidence that Kent sold the same tools using a different identification system shows that the designation system is nonfunctional.

### 7. Likelihood of Confusion in Infringement Context

For trademark infringement claims, once a plaintiff shows a protectible mark, the next step is to "show that the defendant's use of the mark creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the product at issue." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (citation and internal quotation marks omitted). This element "is synonymous with probability of confusion, which is more than a mere possibility of confusion." *Id*. Courts consider "a nonexhaustive list of so-called digits of confusion," when assessing the confusion element. *Id*. (internal quotation marks omitted). But this is not simply an exercise in counting the number of factors to see whether a majority supports a finding of a likelihood of confusion and "[n]o single factor" provides a dispositive basis to making a likelihood determination one way or the other. *See id*. The factors to consider include:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, [] (7) any evidence of actual confusion . . . [and] (8) the degree of care exercised by potential purchasers.

*Id*. (footnotes, citations, and internal quotation marks omitted).[9]

The first factor or digit "refers to the strength of the mark." *Id*. at 478-79. There are four categories that roughly correlate to the five-levels used for distinctiveness of marks set out earlier. *Compare Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (identifying five categories of marks (generic, descriptive, suggestive, arbitrary, and fanciful)) *with Sun Banks of Fla. Inc. v. Sun Fed. Sav. & Loan Ass'n*, 541 F.2d 311, 315 (5th Cir. July 1981) (identifying four categories of strength, (1) a strong mark usually being "fictitious, arbitrary, or fanciful and is generally inherently distinctive"; (2) followed by the "comparatively weak mark, a suggestive mark" that is "protected without proof of secondary meaning"; (3) followed by descriptive marks that tell "something about the product; it is protected only when secondary meaning is shown"; and (4) the weakest mark, generic marks that are not protectible). Extensive third-party use can weaken a mark and negate a likelihood of confusion. *See Sun Banks*, 541 F.2d at 316.

Plaintiffs have presented evidence that they have used the T-xxxx mark since the 1970's. And, while there may not be evidence of every factor to consider with respect to secondary meaning of the Parts Designation System, Plaintiffs have provided evidence to at least create a triable issue as to whether that system has acquired a secondary meaning due to being historically associated with American-made products supplied by Plaintiffs or its distributors. Under these facts, this is a descriptive mark that is protected when secondary meaning is shown. Additionally, while ASG points to extensive third-party use of the T-xxxx mark, Plaintiffs explain much of that use because third-party purchasers who resell the tool are distributors of Plaintiffs. Thus, although the third-party use may weaken the mark to some extent, the weakness itself is lessened to the extent

---

[9] One court has noted that the confusion digits "relate to confusion between competing products, not confusion as to country of origin" and that "[t]here does not appear to be a specific test for what constitutes 'likelihood of confusion' in relation to false designation of country of origin." *York Grp., Inc. v. Horizon Casket Grp., Inc.*, 459 F. Supp. 2d 567, 576 n.10 (S.D. Tex. 2006). Because this case involves alleged confusion due to the supplier of the tools, which also includes confusion due to the country of origin, the Court will consider the confusion digits.

the third parties are indeed Plaintiffs' distributors. Plaintiffs have provided testimony to that effect, whereas Defendant provides no evidence to the contrary.

The second, third, and fourth digits are fairly clear cut. As an alpha-numeric mark, the T-xxxx mark used by ASG and Plaintiffs are identical. The products are likewise identical other than their manufacturer and country of origin. And while ASG sells mostly online, there are overlaps between customers of ASG and Plaintiffs. These factors support finding a likelihood of confusion.

With respect to the fifth digit, "a court looks for advertising in similar media as an indication that consumers might be confused as to the source of similar products." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 332 (5th Cir. 2008). RS has averred that Plaintiffs have invested heavily in advertising and promoting their marks. Both ASG and Plaintiffs rely on the internet to reach customers. There is also evidence of an overlap of customers between Plaintiffs and ASG. This factor supports finding a likelihood of confusion.

The sixth digit can be crucial in ascertaining the likelihood of confusion. *See id.* In a nutshell:

> Proof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement. If such intent can be shown, however, it may provide compelling evidence of a likelihood of confusion. Further, the intent of defendants in adopting (their mark) is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff,) that fact alone may be sufficient to justify the inference that there is confusing similarity.

*Id*. (citations and internal quotation marks omitted).

Here, ASG undoubtedly knew about the Part Designation System before using it for products it obtained from China. There is evidence that can support finding that ASG believed the designation system was not a mark indicative of Plaintiffs' tools. But, viewing the evidence in the light most favorable to Plaintiffs, one may reasonably infer that ASG used the T-xxxx mark for its Chinese tools to derive a benefit from Plaintiffs' reputation. From that same view of the evidence,

one may also reasonably infer that ASG either intended to confuse consumers or simply did not care whether it did so or not. These inferences support finding a likelihood of confusion.

Plaintiffs have also provided at least one example of actual confusion. A distributor of Plaintiffs' tools, Cobra Transmissions, *see* Dep. RS 105:25-106:3, had obtained tools from Transtar under a belief that they were supplied by Plaintiffs, but they were not, *see id*. 108:22-25. Transtar itself switched from purchasing tools from Plaintiffs because it could obtain the T-1503 and T-1574 parts cheaper from ASG. It did not know where the parts came from, but it did not change the numbering system and sold the products as T-1503 and T-1574. It later switched back to purchasing the tools from Plaintiffs.

Based on the above discussion of the first seven digits, the Court finds it unnecessary to consider the eighth digit – the degree of care exercised by potential purchasers. Given the other factors supporting a finding of likelihood of confusion, this factor would not sway the Court's overall findings whether it supports or detracts from finding a likelihood of confusion.

Considering the digits of confusion, the Court finds that, for purposes of summary judgment, Plaintiffs have shown a likelihood of confusion. They have presented evidence that ASG's use of the T-xxxx system "is likely to cause confusion, or to cause mistake, or to deceive as to" the origin or approval of its products. There is also evidence that such use has the potential to deceive a substantial portion of potential customers.

Viewing the facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, the digits of confusion support finding a likelihood of confusion. Through that lens, furthermore, there is at least a triable fact as to whether the T-xxxx mark has acquired a secondary meaning as to American-made tools supplied by Plaintiffs. And, if the mark has in fact acquired such a secondary meaning, then a likelihood of confusion flows naturally from use of such system for tools obtained from a Chinese supplier instead of through Plaintiffs. For an

31

infringement claim under the Lanham Act, using a mark that has obtained a secondary meaning as an American-made product supplied by Plaintiffs is likely to create confusion or to deceive when the mark is applied to a product made in China and not supplied by Plaintiffs. There is at least a triable fact as to whether ASG's use was likely to cause confusion, mistake, or deception as to the origin or approval of products.

Of course, the Court "should consider ASG's nominative fair use claim in conjunction with its likelihood-of-confusion analysis." *Smack*, 550 F.3d at 489. As an affirmative defense, ASG has the burden to show the defense applies. Here, ASG provides no evidence that it informed the public as to what it had copied. Viewing the evidence in the light most favorable to Plaintiffs, ASG copied the tools at issue, obtained them from a supplier in China, and then sold them with the T-xxxx parts designation system that had been exclusively used by Plaintiffs for multiple decades and had achieved a secondary meaning within the relevant community that they were American-made and supplied by Plaintiffs or their distributors. By obtaining the tools from China and a supplier other than Plaintiffs, ASG was not truthfully identifying Plaintiffs' tools to describe its tools or to compare its tools with Plaintiffs' tools. There is no evidence of any such comparison. While the tools may have looked the same or served the same function, using a mark associated with Plaintiffs' American-made tools to describe ASG's Chinese-made tools is deceptive. It is the opposite of using a mark truthfully. Without an accurate statement of origin, the use itself creates a likelihood of confusion as to source. Such use exceeds the "right of fair use." *See id*. at 489. Consequently, the nominative fair use doctrine does not provide a basis to grant summary judgment for ASG.

### 8. **Noninfringement Claim**

Plaintiffs' noninfringement claim requires more discussion. For similar reasons discussed above, use of T-xxxx designation for the tools manufactured in China constitutes a false designation of origin or a false or misleading description or representation of fact. To the extent the T-

xxxx mark has achieved the secondary meaning of being associated with American-made tools supplied by Plaintiffs, use of the mark on Chinese-made tools is literally false, thereby invoking the assumption as to deceit and materiality. And if use of the mark was merely misleading, Plaintiffs have presented evidence of actual deception.

Furthermore, in the noninfringement arena, it is important to recognize that ASG distributed its outsourced products to consumers through Plaintiffs' largest distributor, Transtar, who made no efforts to inform consumers that Plaintiffs were not the supplier. While some of these acts may be properly attributed to Transtar, ASG's act of selling product to Transtar through the use of the T-xxxx designation system can threaten the goodwill of a party's brand and can cause confusion. *See Schlotzsky's, Ltd. v. Sterling Purchasing & Nat. Distribution Co.*, 520 F.3d 393, 399-400 (5th Cir. 2008). Viewing the facts in the light most favorable to Plaintiffs, ASG deceptively used Plaintiffs' brand in an effort to further its position in the marketplace. The use of the T-xxxx designation to represent products supplied from China has the potential to deceive a substantial segment of potential customers.

As to the remaining elements of a noninfringement claim, Defendant only challenges Plaintiffs' ability to show that they have been or are likely to be injured from its use of the T-xxxx designation system. Plaintiffs, however, have provided evidence that they lost significant sales of the tools in question once ASG (and GAT) undercut Plaintiffs' price with products obtained from China. *See* Dep. RS 156:4-11. They have also provided evidence that their reputation was likely injured as the result of ASG's actions. One can satisfy the injury element "even though a party fails to establish a specific amount of actual loss." *Schlotzsky's*, 520 F.3d at 401. Plaintiffs have at least shown a triable factual dispute as the injury element.

### 9. Summary as to Lanham Act Claims

In summary, with respect to Plaintiffs' Lanham Act claims, Defendant's motion fails to the

extent the claim concerns use of the T-xxxx designation system. But the motion succeeds to the extent Plaintiffs' claim concerns use of the other two marks.

## B. Common Law Trademark Infringement and Unfair Competition

Plaintiffs also assert trademark infringement and unfair competition under the common law. Defendant challenges these claims on three grounds: (1) it did not use the ATEC or TRANS TOOL marks, (2) no mark is legally protectible and have not acquired a secondary meaning; and (3) no likelihood of confusion. Mot. at 5.

Texas law regarding trademark infringement under the common law requires the same showing as under the Lanham Act. *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017). Similarly, a claim of "unfair competition under Texas common law presents essentially no difference in issues than those under federal trademark infringement actions." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 n.7 (5th Cir. 2010) (citation and internal quotation marks omitted).

It has been well-established for numerous years that federal claims under 15 U.S.C. § 1125(a) and common law claims for trademark infringement and unfair competition hinge on the same things. *See Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985). "As a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition. The gravamen for any action of trademark infringement or common law unfair competition is whether the challenged mark is likely to cause confusion." *Id*. This case presents no reason to not follow the general rule. Accordingly, Plaintiffs' common law claims survive summary judgment to the extent they are based on ASG's use of the T-xxxx designation system. The claims fail, however, to the extent they are based on alleged use of the other marks.

**C. Civil Conspiracy**

Defendant seeks summary judgment on Plaintiffs' civil conspiracy claim because Plaintiffs cannot establish that it engaged with another person to accomplish an unlawful purpose or lawful business by unlawful means. Mot. at 5. It argues that "Plaintiffs' failure to establish liability on their unfair competition and infringement claims" causes the conspiracy claim to fail. *Id*. at 16. Further, it asserts that there is no evidence of any "'meeting of the minds' with co-defendants, that together and resulting from such a course of action, that ASG performed unlawful acts, or that Plaintiffs have suffered resulting damage." *Id*.

In Texas, there are five defined elements of a civil conspiracy: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *accord WickFire, LLC v. Woodruff*, 989 F.3d 343, 358 (5th Cir. 2021) (setting out same elements), as revised (Mar. 2, 2021); *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (setting out those elements in the context of discussing statutes of limitation). "Civil conspiracy, generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, might be called a derivative tort." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

But "civil conspiracy is not an independent tort" of itself. *Agar Corp.*, 580 S.W.3d at 142. It is "a theory of vicarious liability," where "the damages that matter come from the underlying wrongful act, not the conspiracy itself." *Id*. In other words, "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681. "Civil conspiracy requires an underlying tort that has caused damages." *Agar Corp.*, 580 S.W.3d at 142.

Given the discussion of Plaintiff's infringement and unfair competition claims, it should

be apparent that the civil conspiracy claim survives summary judgment as well. As Texas law recognizes, "a civil conspiracy claim is connected to the underlying tort and survives or fails along-side it." *WickFire*, 989 F.3d at 358 (quoting *Agar Corp.*, 580 S.W.3d at 141); *accord Tilton*, 925 S.W.2d at 681.

Plaintiffs have presented evidence to show that two or more persons – the Faulkner brothers and their companies at least – conspired to accomplish an objective, namely copying Plaintiffs' tools, obtaining foreign imitations, and then marketing and selling the imitations under Plaintiffs' marks in violation of the Lanham Act and Texas common law. There is evidence of resulting damages and underlying unlawful acts.

While ASG quarrels with the proof regarding any meeting of the minds, the Court is re-minded of two historical quotes set out in a Texas Supreme Court case nearly sixty years ago. The Texas Supreme Court first quoted a case from 1854:

> When men enter into conspiracies, they are not likely to call in a witness . . . In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses.

*Int'l Bankers Life Ins. Co. v.* Holloway, 368 S.W.2d 567, 581 (Tex. 1963) (quoting *Jernigan v. Wainer*, 12 Tex. 189, 193 (Tex. 1854)). It then quoted from an 1870 case: "A conspiracy may be proven as well by the acts of the conspirators, as by anything they may say, touching what they intended to do." *Id.* (quoting *Whitmore v. Allen*, 33 Tex. 355, 357 (Tex. 1870)). These ancient truisms led the Texas Supreme Court to state: "The general rule is that conspiracy liability is suf-ficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *Id.* Plaintiffs have satisfied this standard for purposes of summary judgment.

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** *Defendant's All State Gear, Inc.'s Motion for Summary Judgment* (ECF No. 86). With respect to the ATEC and TRANS TOOL marks, Defendant is entitled to summary judgment on Plaintiffs' claims. But with respect to the T-xxxx mark, the motion fails, and to that extent, Plaintiffs' claims will proceed to trial. The parties should meet, confer, and submit an advisory that sets out agreed, proposed trial dates for later this year. To the extent its calendar permits, the Court will endeavor to accommodate joint proposed dates. Further, as set forth earlier, the Court **DIRECTS** Plaintiffs to file properly redacted exhibits consistent with the findings of the Court.

**IT IS SO ORDERED this 1st day of March 2022.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**